UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SEIU HEALTHCARE 1199NW,<br>Plaintiff,<br><br>v.<br><br>CASCADE BEHAVIORAL HEALTH, LLC<br>d/b/a CASCADE BEHAVIORAL HEALTH,<br>Defendant. | No. 2:23-cv-01309-BJR<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## I.  INTRODUCTION

This matter comes before the Court on a Motion for Preliminary Injunction filed by Plaintiff SEIU Healthcare 1199NW (the "Union"). The Union seeks to enjoin closing on the sale of a hospital facility owned by Defendant Cascade Behavioral Health, LLC ("Cascade") pending arbitration on a dispute over provisions in certain Collective Bargaining Agreements ("CBAs") between the parties. The Court held oral argument on September 27, 2023, at which it granted a temporary restraining order pending issuance of this order. Having reviewed the briefs and exhibits filed therewith and considered argument made during the hearing, the Court finds and rules as follows.

ORDER - 1

## II.     BACKGROUND

The Union represents approximately 200 registered nurses, licensed practical nurses, service workers and others, formerly employed by Cascade Behavioral Health at its psychiatric and behavioral health hospital, located in Tukwila, Washington. *See* Decl. J. Hopkins, Dkt. No. 2-2, ¶ 4. That employment has been governed by collective bargaining agreements ("CBAs") in effect during all times relevant to this dispute. The CBAs contain, among other things, successorship clauses that impose certain obligations on Cascade (the "Employer"), including that:

> 22.1 The Employer will give the Union sixty (60) days' advance written notice of its intent to sell or transfer any part of its operations covered by this Agreement.
>
> 22.2 If, as a result of the anticipated sale or transfer, the bargaining unit work affected by the action will continue to be performed at Cascade Behavioral Health, the Employer's agreement with the buyer or transferee (herein, "Successor") will provide:
>
>> 22.2.1 That the Successor will hire Cascade employees in bargaining unit positions, in order of seniority, to perform the work, providing skill, competence and ability are considered substantially equal in the opinion of the Employer;
>>
>> 21.2.2 That the Successor will maintain all terms and conditions of this Agreement in effect as a condition of such sale or transfer and
>>
>> 21.2.3 That the Successor will not hire new employees or assign its own employees to perform bargaining unit work unless or until it has exhausted the list of Cascade bargaining unit employees under [21.2.1] above and vacant positions or unassigned bargaining unit work remain.

*Id.*, Exs. A, B, & C.

Until recently, Cascade Behavioral Health provided "acute, inpatient care for patients deemed by courts in civil proceedings to be an imminent threat to themselves or others," and "to adult patients admitted voluntarily." Decl. J. Lincoln, Dkt. No. 13, ¶ 5. On June 1, 2023, however, Cascade publicly announced the intended closure of the hospital facility, anticipating substantial

ORDER - 2

financial losses for a second successive year. *See id.*, ¶ 13 ("Cascade posted a loss of approximately $8.5 million [in 2022]. As 2023 began, Cascade was projected to lose $9 million or more for that year."). Cascade stopped admitting new patients and by late June had discharged all remaining patients. *Id.* at ¶ 19.

On June 8, 2023, approximately one week after Cascade advised the Union that it was closing, the Washington State Department of Social and Health Services ("DSHS") contacted Cascade to express its interest in purchasing the hospital building. According to both the Chief Development Officer for Cascade's parent company Acadia Healthcare and the Chief Financial Officer for the Department of Social and Health Services ("DSHS"), "this was the first time DSHS, or any other Washington state official, had contacted Cascade about potentially purchasing the real property." Decl. D. Keys, ¶ 5; *see also* Decl. R. Pannkuk, ¶ 12. DSHS's intent was (and is) to acquire the facility for use as a state-run psychiatric hospital, to treat forensic patients (*i.e.*, patients referred for services from the criminal justice system) and civil conversion patients (i.e. patients whose felony criminal charges have been dismissed for reasons of incompetency to stand trial who have been admitted to a state hospital for purposes of an evaluation for civil commitment). *Id.*, ¶ 5.

Relevant to the instant dispute, DSHS has an urgent need for additional capacity, driven in no small part by ongoing litigation in *Trueblood v. Washington State Department of Social and Health Services*, Case No. C14-1178 MJP. *See* Pannkuk Decl., ¶ 9. In that case, filed in the Western District of Washington nearly a decade ago, the court issued a permanent injunction based on a finding that DSHS was violating the constitutional rights of certain pretrial detainees by failing to provide timely competency evaluations and restoration services, due in part to a lack of capacity. *Id.*, ¶ 7. As recently as July 2023, the *Trueblood* court found ongoing violations, and imposed a

ORDER - 3

fine (in addition to the hundreds of millions of dollars in fines already assessed) of $1,000-$2,000/day for every civil conversion patient held in a forensic bed at overcrowded existing state hospitals. *See* Ex. A to Pannkuk Decl. Accordingly, "DSHS has a keen interest in acquiring hospital buildings and other facilities that can be immediately put to use as state-run psychiatric facilities." Pannkuk Decl., ¶ 9. More specifically, "Cascade's hospital building was particularly appealing to DSHS because of the turnkey condition of the site." *Id*., ¶ 14.

By July 31, 2023, Cascade had laid off all Union-represented employees and closed its hospital. Hopkins Decl., ¶ 9. On August 7, 2023, Cascade and DSHS entered into (1) a Purchase and Sale Agreement ("PSA") for sale of the facility and "certain office and kitchen equipment" at a purchase price of $29,950,000, with closing to occur on or before December 31, 2023; and (2) a Lease, beginning August 14, 2023, at $150,000 per month, authorizing DSHS to take possession of the building pending the closing. Exs. B and C to Pannkuk Decl.

After learning of the sale from an article in the Seattle Times, the Union filed a grievance against Cascade, initiating the arbitration process on the question of whether Cascade had breached its obligations under the CBAs' successor clauses by, among other things, not providing the Union with 60 days' notice of its intent to sell the facility, and not requiring DSHS to maintain the terms of the CBAs as a condition of sale. Hopkins Decl., ¶¶ 11, 18; Ex. G. By this lawsuit, filed on August 24, 2023, the Union seeks an injunction to forestall closing on the hospital sale until an arbitrator has ruled on that question. The Union does not seek to interfere with DSHS's lease of the facility or DSHS's plans to begin operations there.

On September 27, 2023, the Court held a hearing and granted the Union's Motion for Temporary Restraining Order, enjoining a closing on the purchase until a ruling on the instant Motion for Preliminary Injunction.

ORDER - 4

### III. DISCUSSION

**A. Legal Framework for Labor Disputes Injunction**

The authority of federal courts to enjoin parties to a labor dispute is generally proscribed by statute. Under the so-called "anti-injunction" provision of the Norris-LaGuardia Act, "[n]o court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute" from committing certain acts, as enumerated in that statute. 29 U.S.C.A. § 104. The Supreme Court, however, has recognized a "narrow" exception to this rule where an injunction is necessary to preserve the ability of parties to a CBA to resolve their dispute through the arbitration process. *See Nat'l Ass'n of Letter Carriers, AFL-CIO v. United States Postal Serv.*, 419 F. Supp. 3d 127, 132 (D.D.C. 2019) (citing *Boys Markets, Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235, 253 (1970)). Subsequent caselaw establishes that an injunction may be appropriate where "an employer makes changes in areas which are subject to the grievance-arbitration procedure, and the union seeks to enjoin the employer from making the changes until the grievance is resolved through arbitration." *Newspaper & Periodical Drivers' & Helpers' Union, Loc. 921 v. San Francisco Newspaper Agency*, 89 F.3d 629, 632 (9th Cir. 1996). The Supreme Court has emphasized that this exception is a narrow one, and that an injunction is available "not to remedy a breach of the collective-bargaining agreement, but rather to hold the parties to their agreement to arbitrate." *United States Postal Serv.*, 419 F. Supp. 3d at 132 (citing *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 407–09 (1976)).

ORDER - 5

### B. Whether Union is Entitled to Injunction Under "Ordinary Principles of Equity"

Under *Boys Markets* and its progeny, "injunctive relief is available when: (1) the collective bargaining agreement contains a mandatory arbitration provision; (2) the underlying dispute is arbitrable; (3) the party seeking arbitration is prepared to arbitrate; and (4) issuance of an injunction would be warranted under ordinary principles of equity." *San Francisco Newspaper Agency*, 89 F.3d at 632 (citing *Boys Markets*, 398 U.S. at 254). There is no dispute here that the first three elements for issuing an injunction within the *Boys Markets* exception have been met: (1) the CBA here contains a mandatory arbitration provision; (2) the dispute at issue is arbitrable; and (3) the Union has represented that it is prepared to arbitrate. The only issues remaining are, under the "ordinary principles of equity" governing an injunction, whether: (1) the Union has demonstrated a likelihood of success on the merits; (2) the Union will suffer irreparable harm in the absence of an injunction; (3) the balance of equities favors an injunction; and (4) the public interest favors an injunction. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008).

### 1. Whether Cascade Has Breached the CBA

To establish a "likelihood of success on the merits" in the context of a *Boys Markets* injunction motion, the Union "need only establish that the position [it] will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." *San Francisco Newspaper Agency*, 89 F.3d at 632 (citations omitted). "To hold the union to a stricter standard of proof would intrude significantly on the arbitrator's function, and result in the type of judicial preemption of the arbitral process." *Nursing Home & Hosp. Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098, n. 3 (3rd Cir. 1985).

Plaintiff argues that Cascade breached its obligations under the CBA by failing to provide the Union notice of Cascade's intent to sell the hospital building, and by failing to require DSHS

ORDER - 6

to maintain the terms of the CBA as a condition of closing. Cascade counters that these obligations have not been triggered by the sale of the facility, which is distinct, it argues, from the sale or transfer of "any part of its operations" contemplated in the CBAs' successor clauses.

The Court holds that the Union's position is not "sufficiently sound" to require an injunction pending arbitration. The plain meaning of the term "any part of its operations" does not include an empty, shuttered piece of real estate. Myriad courts have reached this conclusion. In *International Union, United Mine Workers of America v. Apogee Coal Company*, for example, the Sixth Circuit held that "[t]he plain meaning of the term 'operations' in [the successorship clause of the parties' CBA] is unequivocal. According to Black's Law Dictionary, operation denotes 'the process of operating or mode of action; ... action; activity.' . . . [A]s a matter of law, a mining 'operation,' . . . refers to a mine site or facility *where active coal mining operations are being conducted.*" 330 F.3d 740, 744 (6th Cir. 2003) (emphasis added) (quoting *United Mine Workers of Am., Int'l Union v. U.S. Steel Min. Co.*, 636 F. Supp. 151, 153-54 (D. Utah 1986), *aff'd sub nom. United Mine Workers of Am., Int'l Union v. U.S. Steel Min., Inc.*, 895 F.2d 698 (10th Cir. 1990)). Similarly, the Second Circuit has held that "[t]he term 'operations' within the successorship clause of [the parties' CBA] does not apply to the sale of a mine that has been permanently closed in good faith by a seller that retains no financial interest in any potential future mining activity at the site." *In re Chateaugay Corp.,* 891 F.2d 1034, 1039 (2nd Cir. 1989). Non-mining cases also support the conclusion that an employer's sale of its *assets*—particularly in the context of the closure and liquidation of the employer's business—is distinct from a sale or transfer of its *operations*. See *General Drivers and Dairy Employees, Local No. 563 v. Bake Rite Baking Co.*, 580 F. Supp. 426 (E.D. Wi. 1984) (rejecting unions' position that "the purchase of assets agreement" for the sale of "all equipment, vehicles, office equipment and supplies, trademarks, tradenames, brand names,

ORDER - 7

customer lists, certain purchase orders, and certain inventory," and the "proposed sale of real property," including the employer's plant facilities, violated successor clause imposing obligations in the event "an entire operation or any part thereof is sold, leased, transferred or taken over by sale"). *Bake Rite* is particularly on point, as the Union's attempt to distinguish it as not involving a potential sale of "the operational facilities themselves, as here," is unavailing. Mot. for TRO at 10. In fact, the employer in that case did announce plans to sell its "plant facilities and approximately twenty-seven acres of property on which the plant is situated," which was part of the union's grievance in that case. 580 F. Supp. at 429 (The "unions argue that the purchase of assets agreement with Gardner and the proposed sale of real property violate Articles 4 and 7 of the collective bargaining agreement.").

Here, it is undisputed that Cascade made and announced the decision to cease operations at its hospital before it was approached by DSHS regarding a sale of the building, and that the facility was closed and had ceased operations before the parties entered into a purchase and sale agreement. There was no transfer of Cascade's "operations" or any part thereof because at the time of the sale, no operations existed that could have been transferred.

This conclusion is underscored by the particular circumstances of this case. DSHS is critically in need of an empty facility, in which no operations are currently taking place, to which DSHS can transfer the overflow of its own currently existing operations. Pannkuk Decl., ¶¶ 16-18. There is no aspect of Cascade Behavioral Health that will be operating under DSHS's ownership of the building. *Id.*, ¶ 17 ("DSHS has no intent to take over any services, including inpatient and outpatient services, operated by former Cascade."). According to the undisputed testimony of DSHS's CFO, "DSHS has no interest in acquiring Cascade as a going concern or any part of Cascade's former operations or treatment of their patient population. DSHS has not purchased

ORDER - 8

Cascade's Information Technology systems, nor Cascade's patient and personal files. DSHS will operate the hospital building under a different name than Cascade, for a different patient population than Cascade, and plans to conduct its own operations at the site in order to discharge its own responsibilities to forensic and civil commitment patients." *Id*., ¶ 15. As Cascade points out, DSHS has not purchased Cascade's "licenses, accounts receivable, working capital, bank accounts, patient lists, medical records or patient files, books and records, software, goodwill, government program provider agreements or provider numbers, national provider identifier, tax identification number, or any contracts used in the operation of the business such as those with clinical personnel and vendors." Def.'s Opp. to Mot. Prelim. Inj. at 6 (citing Pannkuk Decl., ¶¶ 18-19; Ex. B).

Finally, the Court rejects the Union's suggestion that Cascade closed its facility in bad faith. There is no evidence in the record that the closure was motivated in any part by an attempt to evade the obligations of the CBAs' successor clauses. The mere propinquity of the dates of the announcement that the hospital was closing, DSHS's initial inquiry, the hospital's closing, and execution of the Purchase and Sale Agreement, without more, does not support a reasonable inference of bad faith. This is particularly true given DSHS's avowed and justifiable motivation for seeking an expedited sale. *See* Pannkuk Decl. ¶ 13 ("DSHS was and is very motivated to pursue the acquisition of Cascade's hospital building as quickly as possible."). In light of these facts, the position that purchase of an empty, closed hospital building is a sale of "any part" of Cascade's "operations" is not, as a matter of law, sufficiently sound. Having thus failed to demonstrate a likelihood of success on the merits, the Union is not entitled to an injunction.

**2. Whether Union Will Suffer Irreparable Harm Occasioned By Lack of Injunction**

The inquiry under the "irreparably injury" element of a *Boys Markets* injunction is not merely whether the plaintiff will suffer an irreparable injury from breach of the CBA, but whether,

ORDER - 9

in the absence of an injunction, the defendant's action will "threaten the integrity of the arbitration process itself.'" *United States Postal Serv.*, 419 F. Supp. 3d at 134 (citing *United Rubber Workers v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1354 (8th Cir. 1995); *Niagara Hooker Emps. Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1378 (2d Cir. 1991)). In other words, the Union is entitled to a *Boys Markets* injunction pending arbitration "only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction." *San Francisco Newspaper Agency*, 89 F.3d at 634.

In addition to having failed to demonstrate its position is "sufficiently sound to prevent the arbitration from being a futile endeavor," the Union here has also failed to demonstrate that it will suffer irreparable harm "occasioned by the lack of a status quo injunction." The injury the Union claims is "[t]he end of employment related to the sale or relocation of a business." Mot. for TRO at 13. Those harms, however, have already occurred, and moreover are attributable not to Cascade's sale of the hospital to DSHS, but to closure of the hospital that took place for legitimate, independent reasons, before that sale. In other words, the injury that the Union claims is irreparable would not be "occasioned by" a lack of an injunction, but by closure of the hospital—an event that has already occurred and that could not be undone by an injunction.

Indeed, there is no reasonable scenario (even if an injunction were to issue) in which an arbitrator's award in the Union's favor could induce Cascade to re-open its hospital and rehire its former employees. Nor could an arbitrator require Cascade to force DSHS to take on Cascade's obligations under the CBAs, even if the arbitrator could somehow order modification of the existing PSA (itself a doubtful proposition), since "[u]nder its existing labor agreements, DSHS is not able to assume any agreements that may have been in place between Cascade and SEIU Healthcare 1199NW." Pannkuk Decl., ¶ 16. Thus an injunction preventing the sale of the hospital

ORDER - 10

to DSHS—ordering Cascade, in other words, to breach the PSA—is the only equitable remedy an arbitrator could even conceivably order Cascade to undertake, and it is one that would not redress the underlying harm the Union has claimed, to wit, the end of employment for the Union's collective bargaining units. Under these circumstances, an injunction maintaining the status quo pending arbitration cannot prevent the claimed irreparable injuries. Since the Union's motion does not implicate the integrity of the arbitration process itself, the claimed injury does not support issuance of an injunction under *Boys Markets* and its progeny.

### 3. Whether Public Interest Favors an Injunction

Finally, the Union's request for an injunction presents one of the keenest instances of potential harm to public interest that the Court can imagine. The dire ongoing situation presented by DSHS's continuing failure to meet its constitutional obligations is well documented and need not be revisited in depth here. *See generally* Pannkuk Decl.; Ex. A. It is sufficient to say that the Court has grave concerns that an injunction could delay or even permanently interfere with DSHS's ability to begin and expand its own operations at the former Cascade facility. This interest, constitutional in magnitude, at least offsets if not outweighs any interest the Union has in driving the best bargain it can for its members, and does not overcome the Union's failure to meet the first two elements required for issuance of a preliminary injunction.

///
///

ORDER - 11

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is DENIED. The Temporary Restraining Order, entered in this matter on September 27, 2023, is hereby DISSOLVED. The Court further orders the parties or either of them to show cause, no later than 14 days from issuance of this order, why this matter should not be dismissed.

Dated: September 29, 2023.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER - 12